UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| BRITTANY WINER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 22-162-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MATTHEW STURGILL and | ) | **MEMORANDUM OPINION** |
| ROBERT MOTT, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants Winchester Police Department Detective Robert Mott and Officer Matthew Sturgill arrested Plaintiff Brittany Winer for trespassing on June 24, 2021.  Sturgill OC sprayed Winer twice after the she failed to comply with orders to exit her vehicle.[1]  Winer claims that the use of the OC spray amounted excessive force and resulted in her suffering serious injury. She sued the defendants under 42 U.S.C. § 1983, alleging that Sturgill violated her federal constitutional right to be free from excessive force and that Mott failed to intervene against Sturgill's unlawful use of force.  Winer further alleges that the defendants violated her constitutional rights when they failed to treat then injuries she suffered from the OC spray.

The defendants have moved for summary judgment on all claims and Winer has moved for partial summary judgment.  [Record Nos. 41 and 45] For reasons that follow, the defendants' motion will be granted, in part, and the plaintiff's motion will be denied.

---

[1]     Oleoresin Capsicum spray, or "OC spray," is a "chemical agent similar to what is commonly known as pepper spray or mace.  It irritates a person's eyes, throat, and nose." *Riddick v. Kiser*, No. 7:20-CV-00081, 2022 WL 17585774, at \*1 n.3 (W.D. Va. Dec. 9, 2022) (citation omitted).

## I. Background

The parties agree on most of the facts regarding Winer's arrest.  To the extent they disagree, the Court cited to the video recording s from the defendants' body cameras which recorded the events.

1.      Winer visited the Winchester, Kentucky office of the Cabinet for Health and Family Services ("CHFS") to report an incident with Tornell Fisher, the father of her three children.  [Record No. 42, pp. 13, 31]  She met with CHFS employee Nicole Smith Favia and Mott to discuss her situation.  [*Id.* at pp. 47-48, Record Nos. 43, pp. 42-43, 46, p. 11]  Favia testified that she was concerned about meet with Winer because the plaintiff "tend[ed] to get very vocal and very aggressive with . . . the team.  Scream and yell, and then have . . . a breakdown, where she would start crying and start screaming again."  [Record No. 46, p. 12]

2.      Winer explained concerns about her children during this meeting and told Favia that she wanted Fisher removed from her home.  [Record No. 42, pp. 47-48]  She presented a bag containing drug paraphernalia, drug residue, and knives, all of which she claimed belonged to Fisher.  [Record Nos. 42, pp. 48-54, 46, p. 14]  Mott noted that Winer "wasn't yelling or jumping up and down" during their meeting, although footage from Mott's body-worn camera ("BWC footage") indicates that Winer became agitated as she spoke about the situation. [Record No. 41-3, Mott BWC Video 1, 20:00-23:30]

3.      While Favia and Mott examined the above items, Winer removed an unloaded gun from her purse.  [Record No. 46, p. 15] Mott was on the phone with Winchester Police Detective Reed at the time asserted "Gun" and told Winer to drop the firearm.  [Record No. 43, p. 56] But Winer continued to wave the weapon despite Mott's admonitions to drop it.

[Record Nos. 43, p. 57, 46, p. 15]  Overhearing Mott's "Gun" comment, Detective Reed called additional officers to assist Mott in escorting Winer from the premises.  [Record No. 43, p. 56]

4.  CHFS employee Vanessa Dennis advised Winer that her children had been approved to stay with the plaintiff's mother for two weeks.  [Record No. 42, p. 48] Dennis and Favia then asked Winer to take a drug test due to her "erratic behavior."  [Record No. 46, p. 18]  Winer declined and "started screaming." [*Id.* at p. 20]

5.  Favia ended the meeting and Mott asked the plaintiff to leave the building.  [*Id.* at p. 22] Favia testified that CHFS employees asked law enforcement to remove Winer from the premises because "[Favia], and the building manager and the supervisor . . . did not want [Winer] on the property.  [They] did not feel comfortable with employees leaving until she left the property."  [*Id.* at pp. 45-46]

6.  Mott escorted Winer to the CHFS parking lot and directed her to leave.  [Record No. 43, p. 59]  Favia and Dennis watched from the door as Winer left because, as Favia explained, no one wanted to go outside due to the plaintiff's actions.  [Record No. 46, p. 24] Around this time, Mott received a call from a security officer at the Kentucky Department for Community Based Services ("DCBS") who informed Mott that Winer was no longer allowed on CHFS property.  [Record No. 43, pp. 66-67]

7.  Mott accompanied Winer to her vehicle, explaining that she needed to leave the premises. [Record No. 43, p. 61]  Officer Sturgill arrived around the time that Mott went inside the building to retrieve Winer's belongings.  [*Id.*]  Sturgill asked Winer if if she would like her car to be towed, explaining that CHFS would likely have the vehicle removed if she left it on the property.  [Record No. 41-4, Mott BWC Video 2, 00:50-01:05]  And Sturgill advised Winer

that she could not drive the car because the tags on her vehicle were invalid.  [*Id.* at  01:05-01:09]

8.      Winer told the defendants that she would call a towing company to remove her vehicle and asked to walk to a restaurant across the street.  [*Id.* at 01:12-01:25]  While Sturgill told Winer she was free to walk to the restaurant, he indicated that she could not stay on CHFS property.  [*Id.* at 01:25-01:32]  Sturgill also asked Winer if she would like a ride home, but the plaintiff declined.  [*Id.* at 02:18-02:22]  Next, Sturgill warned Winer that if he and Mott "ke[pt] getting calls on [her], [she] might end up in jail."  [*Id.* at 02:35-02:40]

9.      Winer left the premises for several minutes.  [Record No. 46, p. 27]  But she returned to the parking lot after observing that a tow truck had arrived to remove her car.  [*Id.* at p. 28]  Winer objected to the removal of the vehicle, entered it on the driver's side, and ignored Mott's warning that she was not permitted to get inside.  [Record No. 43, p. 73]

10.     Mott spoke with Winer for approximately four minutes after she returned to the parking lot.  [Record No. 41-5, Mott BWC Video 2, 00:32-04:28]  He explained that Winer's car was being towed because she was no longer authorized to park on CHFS property and had been asked repeatedly to leave.  [*Id.* at 03:10-03:15, 03:29-03:36]  Winer became increasingly hostile during this conversation, claiming that towing her car was illegal and that Mott could not take it without a search warrant.  [*Id.* at 02:45-02:59]  Winer entered her car and attempted to close the driver's side door, causing Mott to take the plaintiff's hand in an attempt to remove her from the vehicle.  [*Id.* at 04:28-04:36]

11.     Sturgill arrived immediately after Mott's attempt to remove Winer from the vehicle.  He told Winer that she was being arrested for trespassing and twice warned her that he would spray her if she did not comply with the officers' directions to exit the vehicle.  [*Id.*

at 04:59-05:15]  The defendants attempted to remove Winer from the vehicle a second time to

no avail.  [*Id.* at 05:18-05:37] Sturgill pointed the can of OC spray at Winer and gave a final

warning before spraying her.  [*Id.* at 05:45-06:00 ("This is your last chance.  Brittany, this is

your last chance.")]

12.  Winer began to cry after being sprayed and covered her face with a garment.

However, she continued to ignore officers' repeated warnings to exit the vehicle.  [*Id.* at 06:05-

06:18]  The officers coughed in response to the effects of the spray, with Sturgill remarking

that he "[knew] it was rough in there," and that he would "get [Winer] some water" if she got

out.  [*Id.* at 06:26-06:32]  Mott stated that the officers did not "want to use any more force on

[the plaintiff], but [she was] being silly."  [*Id.* at 06:50-06:56]

13.  Ninety seconds after the first spray, Sturgill opened the passenger door and

twice warned Winer that he would spray her again.  [*Id.* at 07:30-07:38]  He then sprayed

Winer a second time after she removed the garment from her face.  [*Id.* at 07:55-08:12]

14.  Winchester Police Department Officer John Best arrived to assist the defendants

in arresting Winer.  [*Id.* at 08:12] Best and Sturgill removed Winer from the vehicle and applied

handcuffs.  [*Id.* at 09:20-10:29]  Winer continued to resist as the officers placed her in the

police vehicle, telling them to "leave [her] alone" and claiming that she "didn't do anything."

[*Id.* at 10:29-11:25]

15.  Sturgill drove Winer from the CHFS parking lot to the detention center.

[Exhibit No. 41-11, Sturgill BWC Video 1, 07:09-11:04]  During the four-minute drive, Winer

stated that she had asthma and could not breathe.  [*Id.* at 07:39-07:50]  Sturgill asked dispatch

for assistance from EMS to decontaminate the plaintiff upon her arrival at the detention center.

[*Id.* at 07:58-08:15] EMS treated the plaintiff as soon as she exited the police cruiser.  [*Id.* at 13:00]

**   **   **   **

Winer filed this action on June 22, 2022, asserting eight claims.  [Record No. 1]   She contends that Sturgill violated her Fourth Amendment right to be free from excessive force when he used OC spray (Counts 1 and 2) and that his actions amounted to battery under Kentucky law (Counts 6 and 7).  [*Id.* at pp. 8-9]  She claims that Mott violated her Fourth Amendment rights when he failed to intervene to prevent Sturgill's use of excessive force (Counts 3 and 4).  [*Id.* at pp. 9-10]  Next, Winer claims that both defendants were deliberately indifferent to her medical needs by failing to promptly treat her injuries resulting from the OC spray.  [*Id.* at pp. 11-12]  Finally, she requests an award of punitive damages.  [*Id.* at pp. 12-13]

## II.  Legal Standard

Entry of summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  To meet that standard, a movant must show that the nonmoving party has failed to produce evidence to support an essential element of his claim.  *See Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted)).  Once the moving party has satisfied this burden, "the opposing party must set forth specific facts showing that there is a genuine issue for trial."  *McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 302 (6th Cir. 2019) (citing Fed. R. Civ. P. 56(e)).  In other words, the nonmoving party must present "significant probative evidence that

establishes more than some metaphysical doubt as to the material facts." *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and alteration omitted).

The Court construes the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It may not weigh the evidence or make credibility determinations but must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52 (1986); *see also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). However, when the parties have submitted video footage of an incident, the Court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 640 (6th Cir. 2015) (noting that in a case with "record of [two] videotape[s] capturing the events in question," the court should view the facts "according to the two . . . videos and filled in by the record taken in the plaintiff's favor").

Finally, in reviewing cross-motions for summary judgment, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted).

### III.  Analysis

### 1.  42 U.S.C. § 1983—Excessive Force

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Courts apply an "objective reasonableness" standard when determining whether an officer's use of force in effecting an arrest violated the Fourth

Amendment, considering the following three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In weighing these factors, courts ultimately ask "whether the totality of the circumstances justifies a particular sort of seizure." *Id.* Moreover, the Sixth Circuit has recognized that the objective reasonableness standard contains a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

Analysis of Winer's Fourth Amendment claims is somewhat altered because Sturgill asserts that he is entitled to qualified immunity. The doctrine of qualified immunity shields defendants from liability under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There is a "two-tiered inquiry" in determining if an officer is entitled to qualified immunity. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012)). First, a court should ask "if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The second question is whether "the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232).

### A. Count 1—The First Use of OC Spray

Winer claims that Sturgill's first use of OC spray was objectively unreasonable because (1) the defendant sprayed her "after having been on the scene for less than two minutes;" (2)

she was being arrested for criminal trespass, a "misdemeanor [that] do[es] not support the use of substantial force;" (3) she did not pose a threat to herself or others while sitting in her car; and (4) she was not attempting to evade arrest. [Record No. 48-1, pp. 14-15]

The defendants see things differently. They assert that Sturgill's initial use of OC spray was reasonable because Winer had refused to comply with verbal commands to leave CHFS premises and resisted attempts to remove her from her vehicle using "soft hand control." [Record No. 41-2, pp. 16-17] In light of Winer's active resistance, they contend that the spray was "a viable alternative as a lesser means of force in attempts to . . . avoid additional hands-on use of force." [Record No. 51, p. 4] Moreover, the defendants explain that spraying Winer was reasonable to protect the officers, the plaintiff, and CHFS employees from harm. [*Id.* at p. 6]

First, the Court agrees that the misdemeanors committed by Winer which resulted in her arrest (i.e., criminal trespass, disorderly conduct, and resisting arrest)were relatively minor. [Record No. 48-1, p. 14] The Sixth Circuit has held that criminal trespass is not a serious offense. *Bolden v. City of Euclid*, 595 F. App'x 464, 470 (6th Cir. 2014) ("as to the severity of the crime [the defendant] believed Martin to be committing, it cannot be disputed that criminal trespassing is a relatively minor offense."). However, disorderly conduct and resisting arrest could involve violent conduct as defined under Kentucky law. *See* KRS §§ 520.090, 525.060. *But see Saunders v. Cuyahoga Metro. Hous. Auth.*, 769 F. App'x 214, 220 (6th Cir. 2019) (finding that disorderly conduct charge "does not qualify as a serious crime" under *Graham*'s first factor).

Winer's account of the facts indicates that her charges did not result from sufficiently violent conduct warranting the use of force. Although she does not dispute that she held a gun

- 9 -

at CHFS, Favia and Mott testified that the plaintiff did not exhibit any hostile behavior during the meeting suggesting that she intended to harm someone. [*See* Record Nos. 43, p. 56, 46, p. 42.] The first *Graham* factor weighs in Winer's favor.

However, Winer's actions in the CHFS parking lot posed a threat to the safety of the defendants. BWC footage confirms that the plaintiff shouted at the officers in close proximity for approximately six minutes and pushed the defendants away on two occasions as they attempted to remove her from her vehicle. [Record No. 41-5, Mott BWC Video 2, 04:28-04:36, 05:18-05:37] Winer's claim that she was "[sitting] in her car, in a parking lot, simply ignoring the officers' commands to exit the vehicle" is not accurate. [Record No. 48-1, p. 14]

Winer also posed a threat to her own safety. She resisted when the defendants attempted to remove her from the car using their hands and, as they explain, any further attempts to use "soft hand control" could have injured Winer. Indeed, Winer admits as much in her response. [Record No. 48-1, p. 15 (noting that if the defendants had continued attempting to remove her from her car using soft hand control, they could have "caused injury to Winer in the form of her arm being pulled out of its socket")]

Finally, Winer threatened the safety of CHFS workers. Testimony from Favia, Mott, and Sturgill indicates that CHFS employees did not feel safe leaving the building until Winer was no longer on the premises. [*See* Record Nos. 43, pp. 42-43, 44, pp. 112-14, 46, pp. 45-46.] The plaintiff contends that she was ordered off the property because Favia harbored personal animus toward her, but that information was not available to the defendants at the time of Winer's arrest. Therefore, any preexisting tension between Favia and Winer does not affect the constitutionality of the defendants' actions. *See Graham*, 490 U.S. 386, 396 (1989)

("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

The third *Graham* factor also weighs in favor of the defendants because Winer actively resisted arrest. Winer ignored the defendants' verbal commands to exit her vehicle for almost six minutes and she actively resisted their attempts to remove her by hand. Sturgill acted in accordance with Winchester Police Department Policy when he opted to use OC spray to remove Winer from the vehicle after determining that a "lower level of force would not be adequate."[2] [*See* Record No. 41-15, p. 5.] Winer claims that the use of force was not justified because she did not intend to drive away from the parking lot, but her argument misconstrues *Graham*. In *Graham*, the Court held that an officer may use force when a defendant is "resisting arrest *or* attempting to evade arrest by flight," not only when the defendant is doing both. *Graham*, 490 U.S. at 396 (emphasis added).

---

[2]     Winchester Police Department policy authorizes officers to utilize force according to an "escalating scale of options." [Record No. 41-15, pp. 4-5] The policy directs officers to use "good judgment" and to discern "the circumstances of a given situation" when determining which level of force is appropriate in response to a risk. [*Id.* at p. 4] The policy prohibits officers from using "a more forceful measure unless it is determined that a lower level of force would not be adequate, or that such level of force is attempted and actually found to be inadequate." [*Id.*] In order of increasing severity, the eight levels of force available to responding officers are: command presence, verbal commands, soft empty hand control, chemical spray, electronic control devices, hard hand control, impact weapons, and deadly force. [*Id.*]

The policy defines soft empty hand control as the officers' "use of hands on the subject to direct the subject's movement" and notes that this method of force has "a low potential of injury to the subject." [*Id.* at p. 5] When a subject "exhibits some level of active resistance/active aggression," chemical spray is appropriate "to temporary [sic] incapacitate the subject." [*Id.*]

The "ultimate question is whether the totality of circumstances justifies a particular sort of seizure." *Id.* Here, Sturgill's conduct was reasonable because he deployed OC spray after Winer continually ignored verbal commands and actively resisted arrest. His conduct also was consistent with department policy. He sprayed the plaintiff after determining that less forceful measures were inadequate. And while the circumstances surrounding the spray may not have been emergent, he acted in response to a reasonable fear for officers' safety as well as the safety of the CHFS workers who were not comfortable exiting the building until Winer left the property.

The plaintiff cites *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009), in support of her claim; however, that case is distinguishable. There, the court found that an officer's use of pepper spray was unreasonable when it was disputed whether the plaintiff "had been told he was under arrest, whether he was resisting arrest or had surrendered, and whether [the defendant] used an unreasonable amount of pepper spray." 567 F.3d at 311. By contrast, BWC footage confirms that Sturgill informed Winer that she was under arrest and that he intended to spray her. This confirms that Winer actively resisted arrest on at least two occasions. [Record No. 41-4, Mott BWC Video 2, 04:59-05:15]

Sturgill's first use of OC spray more closely resembles the facts of *Monday v. Oullette*, 118 F.3d 1099, 1105 (6th Cir. 1997), a case in which the Sixth Circuit held that an officer reasonably pepper sprayed a plaintiff who had attempted to commit suicide and repeatedly refused to go to a hospital. The officer explained that he resorted to pepper spray as an alternative to physical force because "in his experience, using physical force could result in injury to the officers as well as the person to be seized." *Id.* The decision was reasonable because the officer warned the plaintiff that he would use spray "after many minutes of fruitless

discussion," and because the use of physical force could "risk injury and further delay" efforts to get the plaintiff to the hospital. *Id.* at 1104-05. Similarly, in this case, Sturgill sprayed Winer after he and Mott tried to persuade her to exit her vehicle for a combined six minutes. Additionally, his decision to use OC spray (rather than to attempt forcibly extricating her from the vehicle) prevented injury to the officers and Winer.

In summary, Sturgill is entitled to qualified immunity on Count 1. Winer has not raised a genuine issue of material fact indicating that Sturgill used excessive force in effecting her arrest. Moreover, she has not demonstrated that his actions violated any clearly established right under the Fourth Amendment. While it is clearly established that an officer cannot use pepper spray against an arrestee who is "restrained or subdued," spraying an arrestee who is "unsecured, acting violently, and posing a threat to himself or others" is lawful. *Abdur-Rahim v. City of Columbus*, 825 F. App'x 284, 287 (6th Cir. 2020); *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007).

## B. Count 2—The Second Use of OC Spray

Winer asserts that even if Sturgill's first use of OC spray was justified, the second spray amounted to excessive force because the plaintiff was "clearly incapacitated" from the first spray and no longer posed a threat to herself or to others. [Record No. 45-1, p. 12] She also contends that the third *Graham* factor weighs in her favor because BWC footage clearly demonstrates that she did not actively resist the officers after she was sprayed initially. [Record No. 48-1, p. 19] By contrast, the defendants argue that Sturgill's second use of spray was proper because of Winer's continued active resistance after the initial use of the OC spray. [Record No. 51, p. 11]

Disputed issues of material fact preclude a finding of liability or qualified immunity on Count 2.  Under *Graham*'s second factor, Winer has presented evidence indicating that she no longer posed a threat to herself or others after she was first sprayed.  BWC footage indicates that Winer leaned over and covered her face with a garment after the first spray, and that she remained in that position until the defendant sprayed her a second time.  [Record No. 41-12, Sturgill BWC Video 2, 01:20-03:24]   The parties disagree over the extent to which she was incapacitated by the Sturgill's first spray, and BWC footage does not clearly show where the first spray landed.  [Record Nos. 50, p. 3, 53, pp. 3-4] Viewing the facts in the light most favorable to Winer, a reasonable juror could find that she was subdued after the first spray.

Additionally, a triable issue of fact exists regarding whether Winer actively resisted prior to the second spray.  BWC footage reveals that Winer did not exhibit any verbal or physical hostility toward the defendants as she sat in her car and covered her face with a garment during the approximate two minutes between sprays.  And while Winer was told that she was under arrest, her continued refusal to comply with the defendants' orders to exit her vehicle, without other evidence, does not constitute active resistance.  *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (holding that "noncompliance alone does not indicate active resistance; there must be something more").  The defendants' assertion that Winer actively resisted while being handcuffed and placed into the police cruiser, even if true, is irrelevant for purposes of analyzing whether Sturgill's second spray (which occurred before Winer was removed from the vehicle) constituted excessive force.

Conversely, a reasonable juror could find that Sturgill's second use of spray was justified considering the plaintiff's continued defiance.  The defendants' version of the facts suggests that although Winer was somewhat subdued after the first spray, her previous displays

of hostility and erratic behavior, combined with her continued disregard for instructions to exit the car, justified the additional use of force. *See Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 97 (6th Cir. 2012) (holding that tasing plaintiff after he was "arguably subdued" was constitutional because plaintiff refused to remove his arms from underneath his body upon arrest and continued shouting at officers); *cf. Eldridge*, 533 F. App'x at 535 ("Generally, a confrontation leading to an excessive-force suit unfolds in a manner where the suspect causes the officers to be exposed to volatility, hostility, and danger in a way that increases with the passage of time, thus justifying (and often requiring) the use of force."). Likewise, a jury could find that Sturgill's conduct did not amount to a Fourth Amendment violation under the totality of circumstances because he employed a "short burst[] of OC spray." [Record No. 50, p. 3]

Next, Winer has presented issues of material fact regarding whether Sturgill's conduct violated a clearly established right. Winer cites *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994), which held that an officer who allegedly "continued to spray mace in [the] plaintiff's face after he was seated back in the car and was incapacitated" was not entitled to qualified immunity. *See also Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) ("[W]hen we have found excessive force, the suspects were compliant or had stopped resisting."). The court stated that issues of fact existed regarding whether the officer's use of spray was unreasonable because, viewing the facts in a light favorable to the plaintiff, Adams was detained for a seat belt infraction, "was not acting in a threatening or violent manner," and did not actively resist arrest because "he was never told he was being arrested." 31 F.3d at 385.

Similarly, if Winer's version of the facts is accepted, then Sturgill violated the plaintiff's clearly established rights when he sprayed her a second time after she had been

somewhat incapacitated by the effects of the first spray and was no longer resisting arrest.  In short, triable issues of fact have been presented regarding whether Sturgill's conduct violated clearly established law.  He is not entitled to qualified immunity on this issue, and the parties' cross-motions for summary judgment on Count 2 will be denied.

## 2.  42 U.S.C. § 1983—Failure to Intervene

Winer alleges that Mott violated her Fourth Amendment right to be free from excessive force when he failed to intervene against Sturgill's uses of OC spray (Counts 3 and 4).  [Record No. 1, pp. 9-10]  She asserts that she is entitled to judgment as a matter of law on both counts because Sturgill gave "ample notice" that he intended to spray her, and because Mott had sufficient opportunity to prevent his codefendant from acting.  [Record No. 48-1, pp. 20-21]  But Mott argues that he is entitled to qualified immunity on both counts because Winer "failed to present clearly established law that [the defendant] had a constitutional obligation to intervene under the facts presented."  [Record No. 50, p. 6]

"[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (citation omitted).  An officer knows or has reason to know that excessive force will be used if he is present during the alleged use of force and receives notice.  *See Batson v. Hoover*, 788 F. App'x 1017, 1022 (6th Cir. 2019) (denying defendant's motion for summary judgment on failure to intervene claim when sufficient evidence demonstrated that defendant was present during the alleged use of force and could have witnessed his codefendant's actions).

- 16 -

An officer has a duty to intervene when "the underlying episode of excessive force has spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it." *Id.* (citing *Durham v. Nu'Man*, 97 F.3d 862, 868 (6th Cir. 1996) (denying summary judgment for defendant who watched a beating unfold from her nurse's station for "approximately ten minutes"). By contrast, no duty to intervene exists where "an entire incident unfolds 'in a matter of seconds.'" *Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 506 (6th Cir. 2007) (collecting cases). Here, Mott is entitled to summary judgment on Count 3 because Sturgill's first use of OC spray did not violate clearly established law. "If no excessive force was used, [Mott] cannot be responsible for failing to intervene." *Hunt v. Sunquist*, 822 F. App'x 468, 479 (6th Cir. 2020) (citations omitted). And Mott also is entitled to summary judgment on Count 4.

Even if Sturgill's second deployment of OC spray was unreasonable, Mott is entitled to qualified immunity. "[T]he plaintiff bears the burden of showing that a right was clearly established at the time of the alleged constitutional violation." *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020). Winer cites three cases in support of her claim, but none presents circumstances sufficiently analogous to the events surrounding Sturgill's second deployment of OC spray. *See Turner v. Scott*, 119 F.3d at 429-430 (finding that defendant could not have prevented an officer from striking the plaintiff with his shotgun when he did not witness the incident); *Smith v. Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (finding no liability for failure to intervene claim because defendant was attempting to handcuff plaintiff during the use of excessive force); *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x at 506 (defendant did not have a reasonable opportunity to prevent an officer from hitting the plaintiff with his car when the incident occurred during a "six-or seven-second window").

- 17 -

The Sixth Circuit has concluded that a defendant violated a plaintiff's civil rights by failing to intervene after observing a coworker beat the plaintiff for a period of ten minutes. *Durham v. Nu'Man*, 97 F.3d at 868. By contrast, Sturgill's second deployment of OC spray was brief, as only two minutes passed between the first and second spray. The defendants' motion for summary judgment on Count 4 will be granted because Mott could not have understood that his failure to intervene prior to the second spray violated Winer's clearly established rights.

### 3. State Law—Battery

In Counts 6 and 7, Winer asserts that Sturgill committed a battery under Kentucky law when he deployed OC spray to subdue her. [Record No. 1, p. 11] She argues that he is not entitled to qualified official immunity under Kentucky law because his conduct violated her clearly established constitutional rights. [Record No. 45-1, p. 17 (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001))] Conversely, the defendants maintain that Sturgill's conduct was lawful, as "[p]olice officers are privileged under Kentucky law to use reasonable force to make arrests or preserve safety." [Record No. 41-2, p. 21] They also claim that Sturgill is entitled to qualified official immunity because his conduct did not violate any of Winer's clearly established rights and because he did not act with a "willful or malicious intent to harm" when he sprayed her. [*Id.* at 21-22]

Kentucky law defines the subject tort as "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (citation omitted). The Sixth Circuit has recognized that the "use of excessive force by a police officer constitutes the intentional tort of battery."

*Browning v. Edmonson Cnty.*, 18 F.4th 516, 531 (6th Cir. 2021) (citing *Ali v. City of Louisville*, No. 3:03-CV-427-R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006)).

However, officials are shielded from liability under the state law defense of qualified official immunity if they performed a "(1) discretionary act[] or function . . . ; (2) in good faith; and (3) within the scope of the [official's] authority." *Yanero*, 65 S.W.3d at 522. A finding of "bad faith" can be "predicated on a violation of constitutional, statutory, or other clearly established right, . . . *i.e.*, objective unreasonableness; or if the officer . . . willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* at 523.

The first and third prongs of this standard are not in dispute, as "[t]he determination of the amount of force required to effect is a discretionary act and [is] within the scope of [an officer's] authority." *Nichols v. Bourbon Cnty. Sheriff's Dept.*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014); *see also Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. Ct. App. 2016). Accordingly, the viability of the defendant's qualified official immunity defense depends on whether Winer can "establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523. And this analysis closely parallels that of the plaintiff's corresponding federal law claims.

Winer has not established that Sturgill acted in bad faith when he first sprayed her because his conduct did not violate Winer's clearly established rights. Moreover, she has not provided any evidence that Sturgill acted willfully, maliciously, or with a corrupt motive. Thus, he is entitled to official qualified immunity on Count 6. However, Sturgill is not entitled to qualified official immunity regarding the claim contained in Count 7 because genuine disputes of material fact exist regarding whether he violated clearly established law by spraying Winer a second time. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 958

(6th Cir. 2013) ("[R]esolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983."). Winer's motion for summary judgment regarding Count 7 will be denied because she has not conclusively established that the second spray was objectively unreasonable.

The defendants suggest that even if Sturgill's conduct was objectively unreasonable, Winer has failed to demonstrate that he acted with bad faith for purposes of qualified official immunity. They contend that demonstrating bad faith requires both an objective and subjective showing. This argument, however, misreads *Yanero*. [Record No. 41-2, pp. 21-22] Bad faith is established under Kentucky law when "*either* when the officer 'willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive' or when the act is objectively unreasonable—'a violation of a constitutional, statutory, or other clearly established right.'" *Clemons v. Couch*, 768 F. App'x 432, 439 (6th Cir. 2019) (citing *Yanero*, 65 S.W.3d at 523) (emphasis added). Because a factual dispute exists regarding whether Sturgill violated Winer's clearly established Fourth Amendment right when he OC sprayed her a second time, he is not entitled to qualified official immunity under state law.

### 4. 42 U.S.C. § 1983—Deliberate Indifference as to Serious Medical Needs

"[T]he government has a constitutional obligation to provide medical care to those whom it detains." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020) (collecting cases). A pretrial detainee's right to adequate healthcare springs from the Fourteenth Amendment and has both an objective and subjective component. *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021). First, a plaintiff must demonstrate that her "medical need is 'sufficiently serious.'" *Id.* at 591 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). However, if a plaintiff's deliberate indifference claim involves an injury which "is seemingly

- 20 -

minor or non-obvious," medical evidence is required to demonstrate that she suffered from an objectively serious need. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004); *see also Phillips v. Tangilang*, 14 F.4th 524, 534 (6th Cir. 2021) (noting that a plaintiff can demonstrate a serious need "by showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care")

A plaintiff must establish that the defendant acted with a sufficiently culpable state of mind to satisfy the subjective component. A pretrial detainee is required to show that "a reasonable officer at the scene . . . would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and . . . knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi v. Lake Cnty., Ohio*, 29 F.4th 745, 757-58 (6th Cir. 2022). In other words, the plaintiff must prove that the defendant acted with "more than negligence but less than subjective intent—something akin to reckless disregard." *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 605 (6th Cir. 2022).

Winer argues that Mott and Sturgill violated her Fourteenth Amendment rights when they "failed to render medical assistance to [the plaintiff] after she was struck with OC spray" (Count 8). [Record No. 1, p. 11] The defendants argue in response that they adequately cared for the plaintiff's injuries: Sturgill drove Winer directly to the detention center after she was arrested, where she was promptly decontaminated by EMS. [Record No. 41-2, pp. 24-25]

The undersigned concludes that Winer has not demonstrated that her injuries from the OC spray constituted a serious medical need. Multiple courts have held that plaintiffs suffering from the "normal effects associated with pepper spray exposure" have not established a serious medical need for purposes of their deliberate indifference claims. *See, e.g., McDougald v.*

*Eaches*, No. 1:16-CV-900, 2018 WL 3966245, at *6 (S.D. Ohio Aug. 17, 2018) (finding that plaintiff experiencing "breathing problems" and "burning sensations" from pepper spray did not establish a serious medical need); *McGuire v. Union Cnty. Jail*, No. 4:13-CV-P28, 2013 WL 4520282, at *5-6 (W.D. Ky. Aug. 26, 2013) (no serious medical need when plaintiff complained of eyes burning and runny nose after being pepper sprayed); *Censke v. Ekdahl*, No. 2:08-CV-283, 2009 WL 1393320, at *8 (W.D. Mich. May 18, 2009) (plaintiff's complaints of "burning in his nose, lungs, eyes and skin . . . do not constitute a serious medical need").

Winer avers that she could not breathe during her trip to the detention center, and she similarly testified in her deposition that her "asthma and anxiety" heightened her sensitivity to the OC spray.  [*See* Record Nos. 41-12, Sturgill BWC Video 2, 07:30-07:40, 42, p. 141.]  However, she has not provided any medical evidence to support her claim or demonstrate that her alleged conditions rendered her particularly vulnerable to the effects of the spray.  *See Reeves v. Sweet*, No. 1: 04-CV-605, 2005 WL 2417659, at *4 (W.D. Mich. Sept. 30, 2005) ("[A]lthough [p]laintiff complains that he had breathing difficulties [after exposure to pepper spray], he has failed to present facts demonstrating that those difficulties were sufficiently different in degree or type from those experienced by others exposed to the spray.").

Moreover, Winer has failed to establish that the defendants acted with reckless disregard to her medical needs.  BWC footage confirms that Sturgill notified dispatch during the drive to the detention center that Winer stated that she was unable to breathe and would need medical assistance.  [Record No. 41-12, at 08:05-08:20]  And EMS decontaminated her as soon as she arrived at the detention center, approximately four minutes after leaving CHFS.  [*Id.* at [07:05-11:07]  Rather than disregarding Winer's injuries, the record clearly demonstrates that Sturgill acted appropriately when he sought medical help for Winer soon after arresting

her.  *See Bell v. Cumberland Cnty.*, 665 F. App'x 421, 428 (6th Cir. 2016) (holding that defendant's "'prompt summons' of medical help was sufficient to rebut any allegations that [the defendant] was deliberately indifferent towards [the plaintiff's] medical needs").

### 5.  Punitive Damages

Finally, Winer asserts a claim for punitive damages in Count 9 against Sturgill and Mott.  [Record No. 1, pp. 12-13]  She contends that punitive damages are appropriate because the defendants acted "with evil intentions . . . and/or in such a total reckless disregard for the well-established federal rights of [the plaintiff]," [Record No. 1, p. 13]

Winer's claim for punitive damages fails to the extent the plaintiff seeks those damages for claims dismissed pursuant to the defendants' successful motion for summary judgment. *See Grubbs v. Thermo Fisher Sci.*, No. 13-183-DLB, 2014 WL 1653761, at \*3 (E.D. Ky. Apr. 23, 2014) ("[A] claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action.").  However, triable issues of fact exist regarding any claimed punitive damages related to Sturgill's second use of OC spray.

"The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior."  *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986).  Winer has presented a dispute of material fact as to whether Sturgill exhibited "reckless or callous indifference" to her right to be free from excessive force under the Fourth Amendment when he sprayed her a second time.  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  As a result, the defendants' motion for summary judgment will be denied with respect to the plaintiff's claims for punitive damages as it relates to Counts 2 and 7.

## IV.  Conclusion

The defendants' motion for summary judgment will be granted, in part, and denied, in part.  Winer's motion for partial summary judgment will be denied.

Based on the foregoing analysis and discussion, a reasonable juror could not conclude that Sturgill used excessive force against Winer or battered her under Kentucky law when he first used OC spray to subdue the plaintiff in her vehicle.  However, triable issues of fact exist regarding Defendant Sturgill's second use of OC spray.

Mott is entitled to qualified immunity on the plaintiff's failure to intervene claims because Winer has not shown that he was obligated to intervene under the circumstances presented.  Next, Winer's claim alleging deliberate indifference fails because she has not demonstrated that she suffered from a serious medical need or that the defendants' response to her injuries was inadequate.  Winer's request for punitive damages fails as to all counts except Counts 2 and 7.

Accordingly, it is hereby

**ORDERED** that the defendants' motion for summary judgment [Record No. 41] is **GRANTED, IN PART** and **DENIED, IN PART**, consistent with this Memorandum Opinion and Order.  The plaintiff's motion for partial summary judgment [Record No. 45] is **DENIED**.

Dated: May 25, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky